IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NICHOLAS J. ELY,<br><br>        Plaintiff,<br><br>vs.<br><br>ROB JEFFREYS, Director of the Nebraska Department of Correctional Services, in his official capacity, and CRAIG GABLE, Warden of the Reception and Treatment Center, in his official capacity,<br><br>        Defendants. | CASE NO. \_\_\_\_<br><br>**COMPLAINT AND<br>JURY DEMAND** |

## INTRODUCTION

1. More than a year ago, staff of the Nebraska Department of Correctional Services (NDCS) banned Plaintiff Nicholas Ely from speaking with or seeing his wife *indefinitely*. The indefinite ban is in retaliation for Mr. Ely exercising protected First Amendment activity—speaking to his wife through an ordinary, approved phone call, which she later included in an episode of her personal podcast, and writing a book. To this day, Mr. Ely is not allowed to speak to or visit with his wife.

2. While incarcerated at Nebraska's Reception and Treatment Center (RTC), an NDCS facility, Mr. Ely made an appearance on his wife's personal podcast, "More Than an Inmate's Girlfriend." The inaugural podcast episode featured a recording of Mr. Ely's wife, Julie Montpetit, asking Mr. Ely a series of questions during an ordinary, approved call between the two over the prison phone. The two discussed their close relationship, as well as other prisoners' relationships with loved ones outside of prison. The couple talked about love, philosophy, life in prison, and the stigma associated with incarcerated people and relationships between prisoners

and non-prisoners. Mr. Ely spoke of his own personal growth and transformation, his goals, and his positive outlook on life. As a result of speaking on the podcast, NDCS imposed a retaliatory ban indefinitely suspending Mr. Ely's ability to see or speak with his wife.

3. Defendants' animus toward Mr. Ely exercising his right to free expression predates the podcast. In August 2024, while incarcerated, Mr. Ely finished writing a book and sent it to Ms. Montpetit to publish on his behalf. The book aims to "define[] a life of integrity, morals, and value-based decisions" and "give[] a voice to the misunderstood who have been subjugated by society." When Mr. Ely then attempted to purchase his own book utilizing an online ordering system, NDCS staff denied his order, claiming the book would "promote security threat group ideology" and threatening that no book Mr. Ely wrote will ever be allowed into the prison. Mr. Ely was protesting NDCS staff's decision to ban his book when Ms. Montpetit released her podcast episode.

4. Right after the podcast episode was posted, NDCS staff raided Mr. Ely's cell and removed Ms. Montpetit from his approved contact list for an unspecified period of time. NDCS staff provided no rule-based reason for indefinitely banning Ms. Montpetit from Mr. Ely's contact list, and she remains banned to this day. As it stands, no NDCS official has identified *any* rule justifying the ban.

5. Because it could not point to a specific rule, NDCS staff simply stated that Mr. Ely's actions violated the "common-sense policy"—which is not a policy at all. Indeed, no rules exist at RTC or are provided by NDCS that prohibit a prisoner from speaking on a podcast or writing a book. Nevertheless, the NDCS staff's retaliation continues with no end in sight.

6. The ban constitutes an extreme measure, atypical of usual disciplinary measures, imposed arbitrarily for unnamed, nonexistent rule violations. In fact, the indefinite ban ignores NDCS's own regulations prohibiting any form of discipline exceeding ninety days. *See* 68 Neb. Admin. Code, ch. 6, § 011.

7. Moreover, NDCS's indefinite ban has deprived and continues to deprive Mr. Ely of his First Amendment rights. NDCS offers no justification showing the unreasonable punishment is linked to or furthers any legitimate penological interest.

8. NDCS's actions hit Mr. Ely where it hurts most, by indefinitely ending all contact between himself and the love of his life. Defendants continue to violate Mr. Ely's rights under both the U.S. and Nebraska Constitutions by imposing unreasonable restrictions on Mr. Ely's free speech rights and subjecting him to arbitrary punishment with no notice whatsoever of the rules he has allegedly violated.

9. Mr. Ely brings this civil rights action against Defendants Rob Jeffreys, in his official capacity as the Director of NDCS, and Craig Gable, in his official capacity as the Warden of the RTC, to remedy the persistent and ongoing violations of Mr. Ely's constitutional rights.

## PARTIES

10. Nicholas Ely is a prisoner in the custody of the State of Nebraska. He is currently confined at the Reception and Treatment Center, an NDCS facility in Lincoln, Nebraska.

11. Defendant Rob Jeffreys, sued in his official capacity, is the Director of the Nebraska Department of Correctional Services, the agency responsible for managing Nebraska's prisons, including the RTC. In his official capacity, Defendant Jeffreys is responsible for and has executive oversight of all NDCS operations. He is responsible for establishing and administering NDCS policies and programs, including the indefinite ban on Mr. Ely's ability to communicate and visit with his wife. *See* Neb. Rev. Stat. § 83-173.

12. Defendant Craig Gable, sued in his official capacity, is the Warden of the RTC. As the Warden, Defendant Gable is the facility chief executive officer and responsible for the custody, control, and correctional treatment of persons committed as well as the general administration of the RTC, all of which includes the indefinite ban on Mr. Ely's ability to communicate and visit with his wife. *See* Neb. Rev. Stat. §

83-177. Defendant is also responsible for delegating powers and duties to deputy or associate wardens or assistant superintendents in the RTC facility. *Id.*

## JURISDICTION AND VENUE

13. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Mr. Ely's federal causes of action arise under the U.S. Constitution and 42 U.S.C. § 1983.

14. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Mr. Ely's state claims because they are so related to the federal claims that they form part of the same case or controversy.

15. Venue is proper pursuant to 28 U.S.C. § 1391, as Defendants reside in Nebraska and the challenged conduct occurred and continues to occur in Nebraska.

## FACTUAL ALLEGATIONS

**A. Mr. Ely engages in protected First Amendment activity.**

16. Mr. Ely has been incarcerated within NDCS for fifteen years. To bring meaning to his sentence, Mr. Ely spends his time productively. He is passionate about self-improvement and introspection, along with external values such as entrepreneurship, rehabilitation, and prison reform. Among other things, Mr. Ely advocates for reform of the felony murder rule, which holds accomplices to criminal activity to the same level of criminal responsibility as the principal offender, irrespective of intent.

17. In August 2024, Mr. Ely wrote a book while incarcerated at RTC entitled "The Prisoner Manifesto." The book generally addresses self-transformation, character development, networking, and free expression. Mr. Ely describes the book as peaceful and hopeful literature; it "defines a life of integrity, morals, and value-based decisions."

18. Soon after writing the book, his now-wife, Ms. Montpetit, published it. The book is available online for purchase, including through Barnes & Noble's website.

19. Generally, incarcerated people in Nebraska may purchase books through Barnes & Noble.

20. That has not been the case for Mr. Ely, however. When Mr. Ely attempted to purchase his own book through the approved online ordering system. NDCS staff denied his order, claiming the book would "promote security threat group ideology." NDCS staff threatened Mr. Ely that no book he wrote will ever be allowed in prison.

21. In addition to writing his book, Mr. Ely spoke through the first episode of his wife's personal podcast, "More Than an Inmate's Girlfriend." Ms. Montpetit started the podcast to provide a platform to destigmatize people who are incarcerated and their loved ones.

22. Mr. Ely's appearance consisted of an audio recording of an ordinary, approved call between Mr. Ely and Ms. Montpetit. After the call, Ms. Montpetit included the recording on her podcast.

23. To call Ms. Montpetit, Mr. Ely utilized his NDCS provided tablet, on which Ms. Montpetit was an approved caller and through which the couple had routinely spoken without incident.

24. During his appearance, Mr. Ely discussed topics ranging from his close relationship with Ms. Montpetit to his personal philosophy of self-growth. The couple spoke about love, philosophy, life in prison, and the stigma associated with incarcerated people and relationships between prisoners and non-prisoners.

25. Mr. Ely told Ms. Montpetit that a few years ago he had asked God for her to come into his life and that he was grateful his wish came true when he had matured and grown enough to feel he was in a positive place and ready to contribute to a healthy relationship.

26. Mr. Ely identified some of his "favorite moments and favorite memories" as writing to and getting to know Ms. Montpetit.

27. Nothing in the conversation between Mr. Ely and Ms. Montpetit—which lasted fewer than fifteen minutes—implicated prison safety or security. In fact, the opposite is true: Mr. Ely described how he tries to "spend his time as wisely as possible" by reading, writing, and talking about movies, philosophy, and spirituality. He stated that he is "blessed to have a positive outlook on everything," despite his

circumstances and his past choices, and he expressed appreciation for his loving family and good foundation.

28. In his own words, Mr. Ely articulated his healthy outlook and guiding philosophy as follows:

> My great-grandpa's motto was to never have a bad day, and he lived to be ninety-six years old. I thought that was pretty wise, so I adopted it as my own. I try every day to never have a bad day, no matter where I'm at, no matter what's going on. I try to make the best out of it. Good things come with that, really.

29. Mr. Ely also spoke of his efforts to serve as a role model and teacher for other prisoners. He stated he tries to spend his time "help[ing] others become better versions of [themselves] through education and practicing [their] voice." He expressed a wish for others to see people as "more than their crime" and "more than an inmate."

30. By any reasonable interpretation, Mr. Ely attested through the podcast of the sort of personal transformation that NDCS aspires to foster, as reflected in its own mission statement:



**B. Defendants retaliate against Mr. Ely.**

31. Neither NDCS nor RTC, specifically, has any formal or informal policies or procedures governing (1) prisoners speaking through podcasts or other publicly

available forums, or (2) facility-approved non-incarcerated family members and friends recording conversations with their loved ones inside prison.

32. Nor does NDCS or RTC have any policy prohibiting prisoners from writing or publishing books.

33. In other words, Mr. Ely's authorship of his book and his appearance on his wife's personal podcast were both constitutionally protected speech and permissible under prison policy.

34. Despite this, NDCS has continuously retaliated against Mr. Ely for engaging in this constitutionally protected speech.

35. For example, hours after releasing the podcast, NDCS staff raided Mr. Ely's cell and confiscated all his personal property, including daily essentials such as clothing, personal hygiene items, and medication.

36. Five days later, NDCS staff admitted that the raid was in direct response to Mr. Ely writing a book and speaking on his wife's personal podcast.

37. Soon after the raid, NDCS staff doubled down on their retaliatory conduct, removing Mr. Ely's wife, mother, and friend from his phone and email list, thereby prohibiting Mr. Ely from contacting them. NDCS staff provided no reason for or notice of the removal of the contacts—all of whom are among Mr. Ely's closest loved ones.

38. Then, an RTC deputy warden threatened Mr. Ely, stating that solitary confinement was "still an option" if Mr. Ely "kept it up." Given how close in time the threats were to Ms. Montpetit's release of the podcast episode—and the fact that Mr. Ely had engaged in no *actual* misconduct—he interpreted the threats to be a further direct response to his constitutionally protected conduct.

39. Even worse, the same deputy warden promised to discipline Mr. Ely with continuous misconduct reports if Ms. Montpetit failed to take down the podcast. When Mr. Ely asked what rule he violated, the deputy warden responded, "the common-sense policy," claiming the podcast was anti-government, anti-establishment, and anti-authority.

40. Most egregiously, shortly following Ms. Montpetit's immediate removal from Mr. Ely's phone and email list, NDCS staff also banned Montpetit from visiting Mr. Ely—thus *indefinitely* banning Mr. Ely from seeing or speaking with his wife.

41. While the ban does not extend to written letters, Ms. Montpetit lives in Canada, where the Canadian Post is currently on strike, making even written communication exceptionally difficult. Thus, NDCS has effectively prohibited all meaningful forms of communication between Mr. Ely and his wife.

42. Facing total separation, Mr. Ely and Ms. Montpetit decided to marry to affirm their love for each other and attempt to ameliorate NDCS's arbitrary interference with their relationship.

43. NDCS staff initially denied Mr. Ely and Ms. Montpetit's application for marriage, citing NDCS policy 205.4, a policy that this Court found to be facially unconstitutional. *Gillpatrick v. Frakes*, No. 4:18CV3011, 2019 WL 7037367, at *8 (D. Neb. June 7, 2019).

44. While NDCS staff eventually permitted Mr. Ely and Ms. Montpetit to get married at RTC, the ceremony and celebration lasted only twenty minutes before NDCS staff forced Ms. Montpetit to leave the facility. The brief wedding remains the only exception to the indefinite ban in over a year.

45. The retaliation continues. NDCS staff removed another friend of Mr. Ely's from his contact list with no explanation. Even worse, when Mr. Ely drafted a legal complaint to seek redress in court, RTC once again raided his cell and confiscated the handwritten complaint for two weeks.

46. Upon information and belief, Defendants are personally aware of the circumstances in this complaint, because, at minimum, Mr. Ely has grieved the indefinite ban on communication with his wife to both Defendants. Moreover, both Defendants, as the state officials responsible for the policies and procedures of NDCS and RTC, respectively, have the authority to lift the retaliatory ban.

47. Despite this awareness and this authority, Defendants have failed to lift the ban or inform Mr. Ely of the specific conduct for which NDCS is disciplining him.

## FIRST CAUSE OF ACTION
### Unreasonable Restrictions on Free Speech, in Violation of the First Amendment to the U.S. Constitution
### 42 U.S.C. § 1983

48. Mr. Ely re-alleges and incorporates by reference the preceding paragraphs.

49. Defendants, as the officials responsible for the policies and procedures of NDCS and RTC, respectively, have instituted and continue to maintain an indefinite ban on Mr. Ely's ability to communicate and visit with his wife, Julie Montpetit, which constitutes an unreasonable and arbitrary restriction on Mr. Ely's First Amendment right to free speech.

50. Nothing about Mr. Ely's communication or visitation with his wife—a previously approved contact of Mr. Ely's—has ever posed nor presently poses a threat to the security of the public, the facility, NDCS staff, or other incarcerated individuals.

51. Defendants have not, and cannot, offer valid justification for indefinitely restricting Mr. Ely's ability to communicate with his wife that is reasonably related to achieving any penological interest.

52. The indefinite ban has no expiration date and constitutes an ongoing and continuous violation of Mr. Ely's First Amendment rights.

## SECOND CAUSE OF ACTION
### Unlawful Retaliation for First Amendment-Protected Activity
### 42 U.S.C. § 1983

53. Mr. Ely re-alleges and incorporates by reference the preceding paragraphs.

54. Mr. Ely exercised a constitutionally protected right under the First Amendment when he spoke over the phone, pursuant to and consistent with NDCS and RTC policy and procedure, with one of his approved contacts, Ms. Montpetit. Ms. Montpetit recorded the conversation and included the recording on the inaugural episode of her personal podcast.

55. In direct response to Mr. Ely's conversation with this wife, Defendants, as the officials responsible for the policies and procedures of NDCS and RTC,

respectively, took adverse action against Mr. Ely by: (1) confiscating Mr. Ely's personal property; (2) indefinitely removing Ms. Montpetit from Mr. Ely's phone list and email account; (3) indefinitely banning Ms. Montpetit from visiting Mr. Ely; (4) removing Mr. Ely's mother and multiple friends from Mr. Ely's phone list and email account; (5) threatening Mr. Ely with continuous misconduct reports and solitary confinement; (6) denying Mr. Ely and Montpetit's original marriage application; and (7) raiding Mr. Ely's cell and confiscating his handwritten complaint.

56. Defendants, as the officials responsible for the policies and procedures of NDCS and RTC, respectively, took adverse action against Mr. Ely because they harbored retaliatory animus against him. NDCS staff had exhibited a growing animus toward Mr. Ely with the publication of his book. The retaliatory animus at issue in this case is a direct response to Mr. Ely's choice to allow his wife, Ms. Montpetit, to feature a sound recording of a call between himself and Ms. Montpetit on her podcast.

57. Defendants' ongoing and continuous retaliatory conduct toward Mr. Ely would chill a person of ordinary firmness from exercising his First Amendment rights.

58. As a result of Defendants' ongoing and continuous retaliation, Mr. Ely has no permissible, effective method of communication with his wife, Ms. Montpetit.

## THIRD CAUSE OF ACTION
**Deprivation of Intimate Association in Violation of the First Amendment to the U.S. Constitution
42 U.S.C. § 1983**

59. Mr. Ely re-alleges and incorporates by reference the preceding paragraphs.

60. Mr. Ely is lawfully married to and maintains a close and ongoing familial relationship with Ms. Montpetit.

61. Mr. Ely has a constitutionally protected right under the First Amendment to enter into and maintain intimate familial relationships, including the right to communicate, correspond, and visit with immediate family members such as a spouse.

62. Defendants' indefinite ban on Mr. Ely's ability to permissibly communicate with his wife, Ms. Montpetit, arbitrarily violates Mr. Ely's constitutionally guaranteed right to association guaranteed under the First Amendment.

**FOURTH CAUSE OF ACTION**
**Deprivation of Due Process in Violation of the Fourteenth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**

63. Mr. Ely re-alleges and incorporates by reference the preceding paragraphs.

64. Mr. Ely has a right under the Fourteenth Amendment to procedural due process before his First Amendment rights can be curtailed or eviscerated by the government, including Defendants.

65. Defendants violated Mr. Ely's procedural due process rights by: (1) arbitrarily disciplining Mr. Ely for conduct not prohibited by NDCS rules; (2) failing to provide notice of the range of possible consequences for consenting to be recorded for a podcast over the phone by an approved caller; (3) failing to provide a meaningful process for grievance or review; (4) failing to adhere to NDCS policies by removing the bans on communication and visitation for a maximum of ninety days.

66. The Nebraska Administrative Code states that no conduct by an incarcerated person shall constitute an offense unless the code of offenses defines it as such. 68 Neb. Admin. Code, ch. 5, § 002. Nothing in the code of offenses defines the forms of speech at issue here as an offense.

67. Discipline in the form of restriction from correctional facility activities can last no more than ninety days for all violations arising out of one incident. 68 Neb. Admin. Code, ch. 6, § 011. Defendants have subjected and continue to subject Mr. Ely to ongoing and continuous discipline well in excess of ninety days.

68. Defendants' indefinite ban on communication between Mr. Ely and Ms. Montpetit constitutes an arbitrary and severe restriction of a constitutional right in which Mr. Ely retains a liberty interest.

### FIFTH CAUSE OF ACTION
**Unreasonable Restriction on Free Speech in Violation of Nebraska State Constitution art. I, § 5**
**Uniform Declaratory Judgment Act**

69. Defendants' actions constitute an unreasonable restriction on Mr. Ely's right to free speech under the Nebraska State Constitution.

70. The indefinite ban on visitation, phone calls, video visits, and emails between Mr. Ely and his wife, Ms. Montpetit, are not reasonably related to a legitimate penological interest and are substantially broader than necessary to achieve any legitimate goal.

71. Defendants' ban constitutes an ongoing harm that continues to restrict Mr. Ely's rights under the Nebraska State Constitution.

### SIXTH CAUSE OF ACTION
**Retaliatory Discipline in Violation of Nebraska Constitution art. I, § 5**
**Uniform Declaratory Judgment Act**

72. Mr. Ely engaged in protected speech by, among other ways, speaking on the phone with his wife, Ms. Montpetit, who recorded the call for a segment on her podcast.

73. Defendants punished Mr. Ely by banning him from communicating with or seeing Montpetit via phone, email, video visit, or contact visit.

74. Defendants' punishment of Mr. Ely was substantially motivated by the prison's knowledge of the phone call recording being played on a podcast.

75. The retaliatory discipline would chill a person of ordinary firmness from continuing to engage in protected activity.

### REQUEST FOR RELIEF

Plaintiff requests that this Court enter judgment in Mr. Ely's favor and:

76. Declare that Defendants, in their official capacities, are violating Mr. Ely's First and Fourteenth Amendment rights through the conduct alleged above;

77. Enjoin Defendants from enforcing or threatening to enforce the indefinite ban on communication and visitation between Mr. Ely and his wife;

78. Declare pursuant to Neb. Rev. Stat. § 25-21,149 of the Nebraska Declaratory Judgment Act that the indefinite ban on Mr. Ely's ability to communicate and visit with his wife is unconstitutional under the Nebraska State Constitution;

79. Award Plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988; and

80. Grant any such other and further relief as the Court deems just and equitable.

DATED this 24th day of November, 2025.

*/s/ Daniel J. Gutman*
Daniel J. Gutman, #26039
Sydney L. Hayes #27051
University of Nebraska College of Law
First Amendment Clinic
Schmid Clinic Building
P.O. Box 830902
Lincoln, NE 68583-0902
dgutman2@unl.edu
shayes6@unl.edu

*and*

Danielle C. Jefferis, #47213 (Colorado)
1875 N. 42nd Street
Lincoln, NE 68583
(402) 472-3251

ATTORNEYS FOR PLAINTIFF